[Cite as *State v. Sprecker*, 2017-Ohio-7291.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# LAKE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2016-L-098** |
| DONALD SPRECKER, JR., | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Lake County Court of Common Pleas, Case No. 2015 CR 000797.

Judgment: Affirmed.

*Charles E. Coulson, Lake County Prosecutor,* and *Anna C. Kelley,* Assistant Prosecutor, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Charles R. Grieshammer,* Lake County Public Defender, and *Vanessa R. Clapp,* Assistant Public Defender, 125 East Erie Street, Painesville, OH 44077 (For Defendant-Appellant).

CYNTHIA WESTCOTT RICE, P.J.

{¶1} Appellant, Donald Sprecker, Jr., appeals his conviction, following a jury trial, in the Lake County Court of Common Pleas of burglary. The only issue raised on appeal is whether his conviction was against the manifest weight of the evidence. For the reasons that follow, we affirm.

**{¶2}** On December 10, 2015, appellant was indicted for burglary, a felony of the second degree. He pled not guilty and the case proceeded to jury trial.

**{¶3}** In August 2015, Raffaela "Nina" Dellerocili, a 79-year old woman, was living alone in Apartment 12 of a 12-unit apartment complex in Painesville. Nina's trusted friend, Lilly Falin, also lived in the complex. On August 6, 2015, Nina had a mild stroke. She was treated in a hospital for two days and then discharged to a nursing home for one month. While Nina was in the nursing home, Ms. Falin came to her apartment twice daily, once at 6:00 a.m. and once at 9:00 p.m., to feed her cats.

**{¶4}** In the morning on Sunday, August 16, 2015, Ms. Falin entered Nina's apartment as usual. Upon entering the bedroom, she noticed the wire mesh outside the bedroom window was bent down and the window was open. She also saw the bathroom was a mess and the screen was out of the window.

**{¶5}** Ms. Falin went to the nursing home and told Nina her apartment had been broken into. Nina called the police, reported the burglary, and made arrangements to meet them at her apartment that morning. Painesville Police Officer William Sickles met Nina and Ms. Falin at Nina's apartment. Officer Sickles said he did not see any signs of forced entry at the entrance door. He asked Nina to walk him through her apartment and point out anything that was out of order.

**{¶6}** Nina directed Officer Sickles to the bathroom, which was at the rear of the apartment. He noticed the shower curtain had fallen down and was leaning against the bathtub. Officer Sickles saw mud on the rug in front of the tub. He saw the two side-by-side window panes in the bathroom window were haphazardly set up in the window

frame. A sheet of plastic that had been attached outside the window was torn and partially inside the room.

{¶7} In the bedroom, which was next to the bathroom and also at the rear of the apartment, Nina pointed out the blanket on her bed was flipped up. Officer Sickles said it was apparent someone had been looking under the bed.

{¶8} Nina noted the drawers in her dresser were open and their contents disturbed. She said there was a lot of change missing, totaling about $2.00, which she kept in a baggie in her dresser drawer. When Nina moved back into her apartment on September 2, 2015, she found her full bottle of 22 Oxycontin pills was also missing and reported this to Officer Sickles. Based on her prior contacts with appellant, Nina told Officer Sickles she believed he committed this break-in.

{¶9} After going through the bedroom, Officer Sickles went outside and walked around to the back of Nina's apartment where he saw two windows, the bathroom window to the left and the bedroom window to the right. Officer Sickles saw the bathroom window panes were not in their track and were inside-out. The screen to that window was on the ground below it. In that area, the officer saw fresh footprints in the dirt. He also saw puncture holes in the ground, which were consistent with an apparatus used in the burglary. Officers at the scene made a cast of a footprint, but, due to a problem with the casting material, the cast fell apart and was useless for identification purposes.

{¶10} Turning his attention to the bedroom window, Officer Sickles noticed that wire mesh and, over that, a sheet of plastic had been installed outside this window. The plastic was pulled off and the mesh covering the window was pulled down, but still in

3

place. Just outside the bedroom window, Officer Sickles saw more footprints and holes in the ground similar to those he saw beneath the bathroom window. Based on this evidence, Officer Sickles believed the bathroom window was the point of entry.

{¶11} Anngela Brown testified she moved into Apartment 2 of the complex one year earlier in September 2014. At that time she met appellant, who lived next door in Apartment 1. Apartments 1 and 2 are across the parking lot from Apartment 12, Nina's apartment. Anngela and appellant began a romantic relationship in December 2014, and in the same month, Anngela moved in with him in his apartment.

{¶12} Anngela said she had a brain tumor as a child and that, following surgery to remove the tumor, she could not go to "normal school" and had an IEP (individual education plan) in high school. She said her doctors have told her that, due to her brain surgery, "her brain cannot accomplish the right way;" that she is a "slow learner;" and that she has anxiety, depression, and a "severe stress disorder." She said that because of her disability, she is easily frightened. She also has memory issues, which sometimes cause her to remember events out of order and to forget details unless she concentrates on them. She receives SSI benefits due to her disability. Anngela is openly religious and goes to church every week with her grandmother.

{¶13} Anngela testified that on Saturday, August 15, 2015, at around 8:30 p.m., appellant went to Apartment 2 to drink and do drugs with friends who lived there. She said she went to Apartment 2 at about 10:30 p.m. to ask him to come home. A female occupant told Anngela he would come home in 20 minutes, but he did not. Anngela returned to Apartment 2 about an hour later because he still had not come home. She knocked on the door, but appellant did not want to leave.

4

{¶14} Anngela said that at about midnight, appellant came home. He was "mad" at her for bothering him while he was partying next door. They argued and appellant choked her. Later, appellant said he knew a place where he could get some money. Anngela said he took her step ladder from their apartment and told her to come with him. He ran across the parking lot to the back of Nina's apartment. Anngela said she followed him because she did not know what was going on and was afraid.

{¶15} When appellant reached a window behind Apartment 12, he put the step ladder down. Anngela asked him what he was doing. He said that, although the lights in this apartment were on, the tenant is in a nursing home. Anngela said, "Thou shall not steal. This is not a good idea. It's against my religion."

{¶16} Appellant put the ladder near the brick wall and climbed up to the bathroom window. After awhile, he said this is "too hard" and, carrying the ladder, walked over to the bedroom window. He ripped the plastic off the window, but could not get through the wire mesh under it. As a result, he went back to the bathroom window. He climbed the ladder; shook the window panes back and forth until they came off the track; and tossed them to Anngela.

{¶17} Anngela said she caught them and put them off to the side. She said appellant went from the ladder into the apartment. While he was inside, she looked into the bedroom window and saw him looking through the closet, the dresser, and under the dresser. She then climbed up the ladder outside the bathroom window and yelled, "The police are here. You got to get out of there." In fact, the police were not there. Anngela testified she said this to scare appellant into leaving the apartment "because nobody should be in a house to steal stuff."

5

{¶18} After being in Nina's apartment for about 20 minutes, appellant came out of the bathroom window and used the ladder to climb down. He said, "we got to get out of here." Anngela said appellant was carrying a baggie full of coins and a bottle of prescription pills. Appellant picked up the window panes and put them back in the window frame. He grabbed the ladder and ran back to Apartment 1. Anngela said she walked slowly behind him because she did not want to be caught with someone who had just stolen.

{¶19} Once back at the apartment, appellant started arguing with Anngela and again choked her. He threatened to kill her if she told anyone what he had done. Anngela said that at about 12:30 a.m., appellant called her elderly grandmother, Leona Brown.

{¶20} Leona Brown testified that in the early morning hours on August 16, 2015, appellant called her using Anngela's cell phone. Leona said that appellant sounded highly agitated and told her he wanted her to bring him $200 right now. He said the landlord was in the driveway demanding $200 for the rent. Leona hesitated and said she "did not know." Suddenly, she heard Anngela screaming in the background and appellant hung up. Leona called back, but no one picked up the phone. Anngela testified that, in fact, the landlord was not at their apartment, and appellant called her grandmother because he wanted money.

{¶21} Anngela said that after appellant got off the phone, he was angry and started choking her again. He then went to bed. Anngela said she did not call the police because appellant had her cell phone and she was afraid since he had threatened to kill her.

6

{¶22} Anngela said the next morning, appellant woke her up saying, "Oh no, the police are here. What am I going to do? I['ll be] in prison for at least five years." At that time the police were questioning Nina and Ms. Falin outside Nina's apartment. Anngela said she did not leave the apartment to report the burglary at that time because appellant was in the apartment choking her.

{¶23} Anngela testified she broke up with appellant that night (August 16, 2015) because appellant choked and beat her "to death." As a result, she took an ambulance to the hospital.

{¶24} Anngela said after she was released from the hospital on August 17, 2015, she went back to the apartment with a police officer to get her belongings. However, appellant would not let her in.

{¶25} Anngela said she told the officer escorting her what appellant had done the night of August 15-16, 2015, and pointed out to him the apartment appellant had broken into. The officer then took Anngela to her grandmother's home.

{¶26} Officer Sickles said that Anngela's grandmother brought her to the police station on August 18, 2015. Officer Sickles said he was familiar with Anngela from prior contacts with her and "knows how she is due to her disability." He said you have to talk to her slowly and go over things multiple times to get the whole story. However, he said that he interviewed Anngela several times during this investigation and, each time, she was consistent regarding the essential aspects of the burglary.

{¶27} Officer Sickles said that when he first talked to Anngela regarding this case on August 18, 2015, she had recently been released from the hospital. He said she had broken blood vessels in her eyes and red marks on her face. In addition to

7

being strangled and beaten by appellant, she said she was also assaulted in their apartment by a homeless woman appellant invited to stay with them on August 16, 2015.

**{¶28}** Officer Sickles said that during his interview with Anngela on August 18, 2015, she gave a lengthy recorded statement during which she outlined the facts of the burglary and named the same suspect that Nina and Ms. Falin mentioned on August 16.

**{¶29}** Officer Sickles said that after seeing the holes in the ground outside Nina's windows and after Anngela mentioned the step ladder in her statement, on August 19, 2015, he retrieved her ladder. He took it to the area beneath Nina's bathroom window; opened the ladder; and found the legs lined up with the holes they found in the ground, which were still there. He said that, based on this evidence, he was "firmly convinced" this ladder made the holes he saw beneath Nina's windows.

**{¶30}** Officer Sickles said that on August 19, 2015, he went to Apartment 1 to talk to appellant. When asked about the burglary, appellant said he had no idea a burglary had taken place and he did not know anything about it. Appellant told Officer Sickles that at the time of the burglary, he was not home because he was at his brother Dale's house babysitting his children.

**{¶31}** Officer Sickles asked appellant who could have done this. He denied any involvement, but said that during the evening of August 15, 2015, he saw a Hispanic male jump the fence and run behind Apartment 12, at which time appellant said he heard a "tool noise," which sounded like "ting, ting."

**{¶32}** On August 23, 2015, Officer Sickles contacted appellant's brother, Dale Sprecker, and Dale's live-in fiancé, Amanda Mahoney, and asked them if appellant was

8

babysitting their children during the night of August 15-16. Amanda said (and testified at trial) that appellant was not at their home and did not babysit their children that night.

{¶33} On August 26, 2015, Officer Sickles went back to appellant's apartment and told him that in following up on his story about babysitting the night of the burglary, his brother's fiance told him that he, i.e., appellant, was not at their house that night. At that point, appellant abruptly ended the conversation.

{¶34} Officer Sickles said the only fingerprints lifted from any of the items they collected from Nina's apartment were two prints found on one of the bathroom windows and both belonged to Anngela. He learned this information on December 2, 2015. While Anngela did not mention handling the windows in her August 18, 2015 police interview, she testified that when Officer Sickles told her about her prints being on the window, this made her remember she touched the windows when appellant tossed them to her and she explained this to Officer Sickles.

{¶35} The state also presented expert testimony that the absence of appellant's fingerprints on the window did not necessarily mean appellant did not touch it. Mitchell Wisniewski, an expert with the Lake County Crime Lab, testified that a person could touch a smooth surface without leaving a fingerprint for various reasons, such as by making a smudge or by touching the surface lightly and thus not leaving enough ridge detail.

{¶36} After the state rested, appellant testified as the sole witness on his behalf. He said that in 2010, he was convicted of felony trafficking in cocaine and in 2012, he was convicted of felony possession of cocaine. He said that in 2015, he was convicted of falsification for lying to police about two black males breaking into his apartment and

9

assaulting him. Appellant is 41 years old and does not work. He said that in 2015, he was using heroin and crack cocaine.

**{¶37}** Appellant said that on August 15, 2015, at around 8:30 p.m., he went to Apartment 2 "to hang out, get drunk." He said Anngela did not go with him because she does not do drugs and people there were doing drugs. He said one-half hour later, Anngela knocked on the door. He said he opened it and said he would come home in a few minutes. He said ten minutes later, she banged on the adjoining wall, trying to get him to come home. However, he did not want to come home so he stayed in Apartment 2 until midnight.

**{¶38}** Appellant admitted that when he came home, he was "lit" and started arguing with Anngela. However, he denied breaking into Nina's apartment, threatening Anngela, or choking her. He denied having Anngela's phone that night and he also denied calling Anngela's grandmother and demanding $200.

**{¶39}** Appellant said that when he woke up on August 16, 2015, he saw the police were across the parking lot at Nina's apartment talking to her and Ms. Falin. Appellant said that on August 16, 2015, he invited a homeless couple to stay in their apartment. He said that the female told Anngela to do the dishes and when she refused, the woman started fighting with Anngela and injured her.

**{¶40}** Appellant admitted that, although Anngela was injured, he did not go to the hospital with her. He also admitted that when Anngela was discharged from the hospital and came to the apartment with an officer to get her things, he would not let her in.

{¶41} Following the presentation of the evidence, the jury found appellant guilty of burglary as charged. The court sentenced him to two years in prison.

{¶42} Appellant appeals his conviction, asserting the following as his sole assignment of error:

{¶43} "The trial court erred to the prejudice of the defendant-appellant when it returned a verdict of guilty against the manifest weight of the evidence."

{¶44} A court reviewing the manifest weight of the evidence observes the entire record, weighs the evidence and all reasonable inferences, and considers the credibility of the witnesses. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). The court determines whether, in resolving conflicts in the evidence and deciding witness credibility, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *Id.* The discretionary power to grant a new trial should only be exercised in the exceptional case in which the evidence weighs heavily against the conviction. *Id.*

{¶45} Witness credibility rests solely with the finder of fact, and an appellate court is not permitted to substitute its judgment for that of the jury. *State v. Awan*, 22 Ohio St.3d 120, 123 (1986). Therefore, in weighing the evidence submitted at a criminal trial, an appellate court must give substantial deference to the factfinder's determinations of credibility. *State v. Tribble*, 2d Dist. Montgomery No. 24231, 2011-Ohio-3618, ¶30. "The jury is entitled to believe all, part, or none of the testimony of any witness." *State v. Archibald*, 11th Dist. Lake Nos. 2006-L-047 and 2006-L-207, 2007-Ohio-4966, ¶61. "The trier of fact is in the best position to evaluate inconsistencies in the testimony by observing the witness's manner and demeanor on the witness stand -

11

attributes impossible to glean through a printed record." *State v. Williams*, 11th Dist. Lake No. 2012-L-078, 2013-Ohio-2040, ¶21.

{¶46} The role of the reviewing court is to engage in a limited weighing of the evidence in determining whether the state properly carried its burden of persuasion. *Thompkins, supra,* at 390. If the evidence is susceptible to more than one interpretation, an appellate court must interpret it in a manner consistent with the verdict. *State v. Banks*, 11th Dist. Ashtabula No.2003-A-0118, 2005-Ohio-5286, ¶33.

{¶47} The indictment charging appellant with burglary provided: "On or about the 16th day of August, 2015, * * * [appellant] did, by force, * * * trespass in an occupied structure * * * that is a * * * habitation of Raffaela N. Dellerocili, * * * when a person other than an accomplice of [appellant] was present or likely to be present, with purpose to commit in the habitation a criminal offense, to-wit: Theft."

{¶48} Appellant does not challenge the sufficiency of the evidence. Thus, he concedes that the state presented evidence on each element of the offense, including the identity of the perpetrator. Rather, he argues he was more credible than the state's witnesses.

{¶49} Appellant argues on appeal that he said it was Anngela, not him, who committed the burglary. However, he does not cite the record in support. In fact, *appellant never told Officer Sickles and never testified at trial that Anngela committed the burglary or had anything to do with it.* To the contrary, he suggested to Officer Sickles that a Hispanic male he saw earlier that evening behind Apartment 12 committed the burglary. Moreover, appellant did not present any witnesses who implicated Anngela. The only "evidence" on which he relies is the fact that Anngela's

12

fingerprints were on one of the bathroom windows and the fact that the ladder used in the burglary belonged to Anngela. However, the jury obviously believed Anngela's explanation as to how her prints came to be on that window and how appellant used her ladder to commit the burglary.

{¶50} Appellant argues that no evidence was presented that he assaulted Anngela. However, she testified that appellant beat and chocked her on August 16, 2015. Officer Sickles saw the blood vessels in her eyes were broken and the whites of her eyes were red. The fact that Anngela told Officer Sickles she was also assaulted by the homeless female does not contradict her testimony that she sustained injuries to her eyes by being strangled by appellant. In fact, appellant says on appeal that Anngela told police the only injury caused by the homeless woman was the red marks on her face. Further, Anngela's grandmother, Leona Brown, testified that when appellant called her that night demanding money, at one point she heard Anngela screaming. Appellant then hung up the phone and did not pick up when Leona called back. This is consistent with Anngela's testimony that appellant attacked her while he was on the phone with Leona.

{¶51} Appellant argues Anngela's inconsistent statements about the bathroom windows affected her credibility. However, while she testified she did not tell Officer Sickles in her initial police interview that she touched the bathroom windows, the jury obviously believed her testimony that when the officer shared the fingerprint results with her, she remembered touching the windows and disclosed this to him. Appellant argues that Leona's and Anngela's testimony that appellant called Leona after the burglary was not credible because the police did not subpoena the phone records to prove this phone

13

call took place. The jury could reasonably find (as they obviously did) that Anngela's and Leona's testimony regarding appellant's phone call was credible even without the phone records.

{¶52} In determining appellant's credibility, the jury was entitled to consider that he did not tell the truth to Officer Sickles during his investigation. Contrary to appellant's statements to the officer, appellant's brother's fiancé Amanda testified that appellant did not babysit the children the night of the burglary, thus debunking his alibi. The jury was also entitled to consider appellant's prior convictions and his continuing abuse of alcohol and drugs.

{¶53} In weighing the evidence, the jury obviously found the state's witnesses to be more credible than appellant. After reviewing the record, we cannot conclude the jury clearly lost its way and created such a manifest miscarriage of justice that appellant is entitled to a new trial.

{¶54} For the reasons stated in this opinion, the assignment of error is overruled. It is the order and judgment of this court that the judgment of the Lake County Court of Common Pleas is affirmed.


TIMOTHY P. CANNON, J.,

THOMAS R. WRIGHT, J.,

concur.

14