[Cite as *State v. Gipson*, 2019-Ohio-1165.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# LAKE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2018-L-093** |
| EVELYN GIPSON, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Lake County Court of Common Pleas, Case No. 2017 CR 001118.

Judgment: Affirmed.


*Charles E. Coulson,* Lake County Prosecutor; *Teri R. Daniel* and *Adam M. Downing,* Assistant Prosecutors, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Vanessa R. Clapp,* Lake County Public Defender, and *Melissa Ann Blake,* Assistant Public Defender, 125 East Erie Street, Painesville, OH 44077 (For Defendant-Appellant).


CYNTHIA WESTCOTT RICE, J.

{¶1} Appellant, Evelyn Gipson, appeals her conviction in the Lake County Court of Common Pleas, following a jury trial in which she was convicted of Passing Bad Checks and sentenced to eleven months in prison. For the reasons discussed herein, we affirm.

{¶2} On December 14, 2016, Ms. Gipson was shopping at a Toys 'R Us in Mentor, Ohio and wanted to purchase a number of Lego sets and four $500 Visa gift cards. She attempted to pay with a personal check written for the full amount of $2,488.36. Since the check was a starter check containing the name "Evelyn Head" and no street address, the cashier told Ms. Gipson a manager would need to authorize the check. Ms. Gipson responded there was no need to get the manager as she had "done this a thousand times" and knew they needed an authorization code. Ms. Gipson became pushy and aggressive, and proceeded to call for an authorization code as the cashier retrieved the manager. Ultimately, against store policy, the manager keyed in the authorization code provided by Ms. Gipson, which authorized the check and allowed her to leave with the merchandise.

{¶3} Toys 'R Us never presented the check to a bank for payment. After its acceptance, the check was flagged as suspicious as it was a starter check with no address, an unreadable, handwritten phone number, and the high dollar amount. A Toys 'R Us manager called the Mentor Police Department. Officer Cox investigated the check and ran a database search for the drivers' license number Ms. Gipson had provided; the results showed the license belonged to a person with a different name and physical description than Ms. Gipson.

{¶4} On February 12, 2018, Ms. Gipson was indicted on one count of Passing Bad Checks, a felony of the fifth degree, in violation of R.C. 2913.11(B), and one count of Theft, a felony of the fifth degree, in violation of R.C. 2913.02(A)(3). She waived her right to be present at arraignment, and pleas of "not guilty" were entered on her behalf.

**{¶5}** On May 15, 2018, the case proceeded to jury trial, where she was found guilty of both counts. Sentencing was deferred, and a presentence investigation was conducted. On June 18, 2017, the court merged count two into count one for purposes of sentencing, and she was sentenced to eleven months in prison. Ms. Gipson now appeals, assigning three errors for our review.

**{¶6}** Her first assignment of error states:

**{¶7}** "The trial court erred to the prejudice of the defendant-appellant when it failed to grant defendant-appellant's request to remove a prospective juror for cause, while granting the state of Ohio's similar request to remove a prospective juror for cause, thus depriving her of the right to a fair and impartial jury as guaranteed by the Sixth and Fourteenth Amendments to the United State Constitution and Section 1 Article 10 of the Ohio Constitution."

**{¶8}** Under this assignment of error, she presents two related issues for our review. The first states:

**{¶9}** "The trial court committed reversable error when it denied the Defendant-Appellant's request to excuse Prospective Juror Davis for cause where Prospective Juror Davis gave responses during voir dire that indicated he could not be fair and impartial."

**{¶10}** The second issues presented states:

**{¶11}** "The trial court committed reversible error when it granted the State's request to excuse Prospective Juror Stohr for cause, particularly after having denied Defendant-Appellant's similar request with respect to Prospective Juror Davis."

**{¶12}** A court of appeals reviews a trial court's ruling on a challenge for cause for an abuse of discretion. *State v. Courie*, 11th Dist. Ashtabula No. 2014-A-0043, 2015-Ohio-2894, ¶18. An "abuse of discretion" is a term of art, "connoting judgment exercised by a court which neither comports with reason, nor the record. An abuse of discretion may be found when the trial court 'applies the wrong legal standard,

3

misapplies the correct legal standard, or relies on clearly erroneous findings of fact.'" (citation omitted) *Id.*

{¶13} When evaluating whether a defendant was denied a fair and impartial jury "[t]he relevant inquiry * * * is '"whether the composition of the jury panel as a whole could possibly have been affected by the trial court's error."'" (citations omitted) *State v. Broom*, 40 Ohio St.3d 277, 287 (1988). Thus, in order for a constitutional violation to occur, the defendant must have used all of his peremptory challenges and be able to demonstrate that one of the jurors seated was not impartial and that juror in question must have been challenged for cause. *Id.  See also State v. Freshwater*, 11th Dist. Lake No. 2002-L-041, 2004-Ohio-384, ¶17. Otherwise, "he is presumed to be impartial and the defendant was not forced to use a peremptory challenge." *Id.*, quoting *Broom*, *supra*.

{¶14} Here, after her request to remove Prospective Juror Davis for cause was denied, Ms. Gipson used a peremptory challenge to remove Mr. Davis. By the end of voir dire, Ms. Gipson had used all her allotted peremptory challenges. In her appeal, Ms. Gipson likens her case to the facts in *Freshwater, supra,* in which we found the trial court abused its discretion in not dismissing a juror for cause. There is, however, a key distinction. Importantly, unlike in *Freshwater,* Ms. Gipson did not challenge any individual of the jury that was ultimately empaneled, nor has she argued any juror empaneled would have been removed had she had a peremptory challenge available. Thus, Ms. Gipson has not been denied a right to an impartial jury by being "forced" to use a peremptory challenge.

4

{¶15}  Moreover, even if Ms. Gipson were arguing she would have used her peremptory challenge on a juror who was empaneled, we do not find the trial court abused its discretion in denying dismissal for cause of Prospective Juror Davis while dismissing for cause Prospective Juror Stohr.

{¶16}  Ms. Gipson challenged Mr. Davis because his son was a Mentor Police Officer.  Mr. Davis's son was not directly involved in Ms. Gipson's investigation and Mr. Davis denied knowing the investigating and testifying Officer Cox.  Mr. Davis said his son mentions some of the interesting cases he works on but not by name.  This further distinguishes her case from *Freshwater* in which the Prospective Juror Hawkins was familiar with the appellant and his family, was himself a prosecutor for the Lake County Sheriff's Department, and was presently involved in an investigation of appellant's brother in a matter related to what the appellant there was facing.

{¶17}  Here, the trial court asked if Mr. Davis would have any concern or if it would influence his decision-making knowing that he may talk with his son after the case about his finding.  Mr. Davis responded, "It shouldn't," and "No. It will be fine." These responses are again distinguishable from the prospective juror's responses in *Freshwater.*  There, the Prospective Juror Hawkins stated "'Freshwater might be a problem for me' but that he would 'try to be impartial.'" *Freshwater, supra,* at ¶25.  We found those to be "hardly the words of a juror confident in his ability to remain detached and able to render an unbiased verdict." *Id.*  Unlike in *Freshwater,* Mr. Davis never expressed doubt as to his impartiality.  Ms. Gipson disagrees, pointing to the following exchange between her counsel and Mr. Davis:

{¶18}  Counsel: A police officer. So the fact that he's a police officer and it's your son does that lead you to give more weight or less weight

5

as far as credibility than anyone else; than a regular person like say myself or anyone?

**{¶19}** Mr. Davis: I'd give him more weight.

**{¶20}** Counsel: You'd give him more weight –

**{¶21}** Mr. Davis: Yeah.

**{¶22}** Counsel: – as a police officer?

**{¶23}** Mr. Davis: Yes.

**{¶24}** Counsel: You figure what the cop's telling you is the truth.

**{¶25}** Mr. Davis: Right.

**{¶26}** We read Ms. Gipson's question to be inquiring into the credibility of Mr. Davis's son, not police officers in general. We cannot agree that the trial court was clearly erroneous in not finding cause for dismissal, in light of the entire conversation with Mr. Davis. In reviewing the court's decision, we cannot substitute our judgment for that of the trial court, who had the opportunity to observe Mr. Davis's body language and voice tone and thereby evaluate his sincerity. Thus, we find the court did not abuse its discretion in declining to excuse Prospective Juror Davis for cause.

**{¶27}** Prospective Juror Stohr, unlike Prospective Juror Davis, expressed clear and acknowledged bias, making statements such as: "I have feelings. I don't know about being fair and impartial because of my past, things that have happened in the past," and "I just don't know if the truth will be presented." The court and Mr. Davis had the following exchange:

**{¶28}** Court: Based upon your past experience, and the fact that the Lake County Prosecutor's Officer is representing the case here, do you think you'd be able to set that aside and be fair and impartial in this case or do you think that would affect your ability to do that?

**{¶29}** Mr. Stohr: I really think it would affect my ability to do that.

6

{¶30} In talking with the prosecutor, Mr. Stohr stated, "I don't know if you would present the true facts. * * * I think it would be twisted. That's just the way I feel." Furthermore, in talking with Ms. Gipson's counsel, counsel asked Mr. Stohr if he would be able to set aside his feelings and listen to the evidence presented in this case and form an opinion. Mr. Stohr's responses show an acknowledged bias.

{¶31} Mr. Stohr: I will form an opinion. I don't know if it's unbiased. But, you know, it's just going to be my formed opinion.

{¶32} * * *

{¶33} Mr. Stohr: There's always that stuff back in the back of my mind; it's going to be there.

{¶34} * * *

{¶35} Counsel: But if you can take that and separate, 'I'm not going to decide this case based on everything that's happened to me,' and what they say too. You decide it based on what they testify to. * * * And then apply that and elevate it, using your life experience; good, bad and the ugly and all that stuff, and then make your decision based on that, based on the evidence; take it into consideration. Do you feel you can do that?

{¶36} Mr. Stohr: I think I could, yes.

{¶37} When the state asked Mr. Stohr be removed for cause and the court granted the challenge, Ms. Gipson countered by pointing to the above conversation. However, this line of questioning does not remove doubt about his ability to be unbiased. The question both asked him if he could set aside what happened to him and asked him to make a decision based on his experiences. Mr. Stohr's affirmative responses do not confidently express his ability to remain neutral and unbiased, especially in light of his prior repeated and consistent expressions of doubt. Thus, we find the court did not err in excusing Prospective Juror Stohr for cause.

{¶38} Ms. Gipson's first assignment of error is without merit.

**{¶39}** We turn now to Ms. Gipson's second and third assignments of error, which we address jointly as the same facts are pertinent to each argument. Her second assignment of error asserts:

> **{¶40}** "The trial court erred to the prejudice of the defendant-appellant when it denied her motion for acquittal under Crim.R. 29(A)."

> **{¶41}** The issue present for review states:

> **{¶42}** "The trial court erred in denying Defendant-Appellant's Crim.R. 29 Motion for Judgement of acquittal where the State failed to provide sufficient evidence to establish beyond a reasonable doubt all elements of the offenses charged."

**{¶43}** A Crim.R. 29 motion "challenges the sufficiency of the evidence introduced by the state to support a conviction." *State v. Figueroa*, 11th Dist. Ashtabula No. 2016-A-0034, 2018-Ohio-1453, ¶32. When reviewing the sufficiency of the evidence, we are required to weigh the evidence in favor of the prosecution. *State v. Jenks,* 61 Ohio St.3d 259, (1991), paragraph two of the syllabus, superseded by constitutional amendment on other grounds in *State v. Smith,* 80 Ohio St.3d 89 (1997). The question is whether "'a reasonable mind might fairly find each element of the offense beyond a reasonable doubt.'" *State v. Bridgeman*, 55 Ohio St.2d 261, 263 (1978), quoting *United States v. Collon*, 426 F.2d 939, 942 (6th Cir.1970).

**{¶44}** Crim.R. 29(A) states in pertinent part, "[t]he court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses." *Id.* "Pursuant to Crim.R. 29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different

8

conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt." *Bridgeman, supra, at 261.*

**{¶45}** Her third error assigned for our review states:

**{¶46}** "The trial court erred to the prejudice of the defendant-appellant when it returned a verdict of guilty against the manifest weight of the evidence."

**{¶47}** The issue presented under this assignment of error states:

**{¶48}** "The conviction of the Defendant-Appellant was not supported by competent, credible evidence which proved her guilt beyond a reasonable doubt."

**{¶49}** A court reviewing the manifest weight of the evidence observes the entire record, weighs the evidence and all reasonable inferences, and considers the credibility of the witnesses. *State v. Sprecker*, 11th Dist. Lake No. 2016-L-098, 2017-Ohio-7291, ¶44, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). In resolving conflicts in the evidence and deciding witness credibility, the court determines whether the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *Thompkins, supra*, citing *State v. Martin,* 20 Ohio App.3d 172, 175 (1st Dist.1983). "'The discretionary power to grant a new trial should only be exercised in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins, supra,* citing *Martin, supra,* at 720-721. "The role of the reviewing court is to engage in a limited weighing of the evidence in determining whether the state properly carried its burden of persuasion. If the evidence is susceptible to more than one interpretation, an appellate court must interpret it in a manner consistent with the verdict." (citations omitted) *Sprecker, supra*, at ¶46.

{¶50} As the court merged count two, theft, into count one, passing bad checks, we address only Ms. Gipson's conviction of passing bad checks in violation of R.C. 2913.11(B).

{¶51} R.C. 2913.11(B) states, "[n]o person, with purpose to defraud, shall issue or transfer or cause to be issued or transferred a check or other negotiable instrument, knowing that it will be dishonored or knowing that a person has ordered or will order stop payment on the check or other negotiable instrument." Ms. Gipson specifically challenges the evidence presented to prove she knew the check would be dishonored and had the purpose to defraud. As Ms. Gipson focused her arguments on her lack of knowledge it would be dishonored, we begin by addressing that element.

{¶52} R.C. 2913.11(C) states circumstances under which a defendant may be presumed to have known the instrument would be dishonored. It states:

> {¶53} For purposes of this section, a person who issues or transfers a check or other negotiable instrument is presumed to know that it will be dishonored if either of the following occurs:

> {¶54} (1) The drawer had no account with the drawee at the time of issue or the stated date, whichever is later;

> {¶55} (2) The check or other negotiable instrument was properly refused payment for insufficient funds upon presentment within thirty days after issue or the stated date, whichever is later, and the liability of the drawer, indorser, or any party who may be liable thereon is not discharged by payment or satisfaction within ten days after receiving notice of dishonor.

{¶56} Neither criterion for presumption of knowledge is met here. First, Ms. Gipson did have an account, albeit with a negative account balance, with the bank for which she presented the check. Second, Toys 'R Us never presented the check for payment because it was flagged as suspicious and pulled after being accepted but before it could be processed. Failing to meet the presumption, however, is not fatal.

10

R.C. 2913.11(C) allows for a presumption of knowledge the check would be dishonored; it does not provide the exclusive means by which the state can prove this knowledge. *See State v. Kerr,* 6th Dist. Wood No. WD-08-008, 2009-Ohio-1470 ¶14. The prosecution may present other evidence to prove this element, as the state did here. *Id.*

{¶57} The state showed that at no time in the history of the account was the balance sufficient to cover the amount of the check she wrote. Even if Ms. Gipson did not know the exact amount in her account at the time she wrote the check, she knew how much money she deposited into the account, which was opened less than two months earlier, the sum total of which was testified to be only $978.00. The vast difference in amount of the check as compared with her total deposits into the account also support a finding she knew the check would be dishonored.

{¶58} Ms. Gipson further argues that because Toys 'R Us employees did not follow store policy by accepting the check and by not presenting the check for payment, she was denied the opportunity to learn her account had insufficient funds. This assertion presupposes that the only way she was able to learn she had insufficient funds was to have the check denied. However, a bank employee testified that Ms. Gipson could have obtained her current account balance by calling the bank, logging into her account online, or stopping into the bank.

{¶59} She also argues that at the moment she presented the check, there was no evidence to suggest she would not make good on the check. This, however, is not determinative. The facts remain that at the moment she presented the check, she did not have sufficient funds in her account to make good on the check and that she did not

11

put funds into her account in the days that followed to attempt to make good on the check before the bank presented it for payment.

{¶60} Moreover, a bank representative testified that the bank automatically mails notices to accountholders when a check was presented to the bank but returned for insufficient funds. The state entered into evidence her twelve such overdraft notices regarding eighteen returned checks that the bank mailed to Ms. Gipson at the address she provided when opening the account. The notices expressly instructed her to discontinue writing checks until she had a positive account balance. Seven notices were mailed before the date of the incident in question (11/7/16; 11/17/16; 11/25/16; 12/1/16; 12/6/16; 12/9/16; 12/12/16); five were mailed in the nine days between her presenting the check to Toy 'R Us and her account being closed (12/14/16; 12/15/16; 12/19/16; 12/20/16; 12/21/16). She did not make any deposits into her account in December.

{¶61} Ms. Gipson argues that the state did not present any evidence that Ms. Gipson actually received these overdraft notices. The Sixth District Court of Appeals addressed a similar argument in *Kerr*. The arguments and relevant facts are substantially analogous. There, the court concluded that "the trier of fact could infer that, because he received multiple prior notices from the bank that the account was overdrawn and then never deposited funds to cover the checks, he wrote the checks with knowledge that it would be dishonored." *Kerr, supra,* at ¶34. The court noted "[a] failure to prove actual notice under this statutory section [R.C. 2913.11(C)], however, only means that the state cannot be afforded the presumption that [the defendant] possessed that element of the offense. Instead, the state may and did introduce other

12

evidence demonstrating that [the defendant] issued a check knowing that it would be dishonored." *Kerr, supra,* at ¶32. We agree with the Sixth District's reasoning and apply the same here.

{¶62} We find that the evidence was sufficient to justify the trial court's denial of her motion for judgment of acquittal and that the jury's findings were supported by weight of the evidence on the knowledge element required for passing bad checks.

{¶63} The second element Ms. Gipson challenges is the purpose to defraud. R.C. 2913.11(D) states circumstances under which a defendant may be presumed to have the purpose to defraud. It states:

{¶64} For purposes of this section, a person who issues or transfers a check, bill of exchange, or other draft is presumed to have the purpose to defraud if the drawer fails to comply with section 1349.16 of the Revised Code by doing any of the following when opening a checking account intended for personal, family, or household purposes at a financial institution:

{¶65} (1) Falsely stating that the drawer has not been issued a valid driver's or commercial driver's license or identification card issued under section 4507.50 of the Revised Code;

{¶66} (2) Furnishing such license or card, or another identification document that contains false information;

{¶67} (3) Making a false statement with respect to the drawer's current address or any additional relevant information reasonably required by the financial institution. *Id.*

{¶68} The state presented evidence to show her bank account was opened with an incorrect social security number; one digit, which should have been a one, was entered as zero. She signed a bank document specifically attesting her social security number, which was typed just to the right of her signature, was correct. She asserts this was a typographical error on the part of the bank, pointing to the close proximity of the one and zero on a numeric keypad.

13

{¶69} When reviewing the sufficiency of the evidence, we are required to weigh the evidence in favor of the prosecution. *Jenks, supra.* As such, by showing Ms. Gipson attested to the accuracy of her social security number when her bank account was opened when it was in fact incorrect, and in viewing this fact in the light most favorable to the prosecution, the prosecution is entitled to a presumption of purpose to defraud provided by R.C. 2913.11(D)(3). Thus, for her second assignment of error, we find the state presented sufficient evidence to show Ms. Gipson had the purpose to defraud for Passing Bad Checks.

{¶70} For her third assignment of error, challenging the manifest weight of the evidence, we do not weigh the evidence in favor of either party, but rather "sit as the 'thirteenth juror' and decide whether a greater amount of credible evidence supports an acquittal such that the jury 'clearly lost its way' in convicting the appellant." *Kerr, supra,* at ¶17, citing, *Thompkins, supra,* at 387. We must also recognize that the jury was in the best position here to judge the credibility of witnesses and the weight to be given to the evidence. *State v. DeHass,* 10 Ohio St.2d 230, paragraph one of the syllabus. Even if we granted the social security number error was a typographical error on the part of the bank, eliminating the statutory presumption of purpose to defraud, we still maintain that the additional evidence the state presented supports a finding of purpose to defraud.

{¶71} The purpose to defraud element is defined by R.C. 2913.01(B): "'Defraud' means to knowingly obtain, by deception, some benefit for oneself or another, or to knowingly cause, by deception, some detriment to another." We have held that the avoidance of paying a debt in a timely manner constitutes a benefit for purpose of

14

showing defraud as applied to R.C. 2913.11. *State v. Doane,* 69 Ohio App.3d 638, 650-651 (11th Dist.1990). Here, the merchandise was never recovered. Thus, it is fair to conclude she was benefited by the transaction in her receipt of Lego sets and Visa gift cards, while Toys 'R Us was deprived of merchandise without payment thereof.

{¶72} Purpose to defraud also requires that she acted by deception. Deception is defined, for purposes of this statute, as:

{¶73} knowingly deceiving another or causing another to be deceived by any false or misleading representation, by withholding information, by preventing another from acquiring information, or by any other conduct, act, or omission that creates, confirmed, or perpetuates a false impression in another, including a false impression as to law, value, state of mind, or other objective or subjective fact. R.C. 2913.01(A).

{¶74} Ms. Gipson admits in her brief that "at the moment [she] offered the check as a form of payment, there was no evidence to suggest she would not make good on the check." This supports a finding of deception. Indeed, "when a payee knows that a check is not collectable at the time it is tendered, there can be no crime of passing a bad check" because the payee has not relied on the check and the debt remains. *State v. Edwards,* 141 Ohio App.3d 388, 395 (8th Dist.2001), citing *State v. Harris* 7 Ohio Misc.2d 43, 44 (1982).

{¶75} The state presented evidence to show that at the time Ms. Gipson presented the check to Toys 'R Us, her checking account did not contain sufficient funds to cover the full amount of the check. Her checking account was closed eight days after the transaction, according to bank records, due to a negative account balance, "fraud and wrong social [security number]." Further, the state presented evidence to show that at no time was Ms. Gipson's account ever sufficient to cover the

15

amount of the check, and in fact the total sum of the deposits over the two months the account was open was testified to be only $978.00.

**{¶76}** In addition, the cashier testified that Ms. Gipson clearly hesitated before selecting a checkout line and became pushy and aggressive with the cashier and manager. She called for the authorization number herself, which is very uncommon and against store policy; and the cashier noted she used the check to purchase Visa gift cards, which can be used like cash and are commonly purchased fraudulently. Finally, Ms. Gipson presented a drivers' license which did not belong to her.

**{¶77}** We conclude the evidence was sufficient to justify the trial court's denial of her motion for judgment of acquittal and that the jury's verdict was not against the weight of the evidence on the purpose element required for passing bad checks. Thus, her second and third assignments of error are without merit.

**{¶78}** For the reasons discussed herein, the judgment of the Lake County Court of Common Pleas is affirmed.

THOMAS R. WRIGHT, P.J.,

MATT LYNCH, J.,

concur.

16