[Cite as *State v. Mugrage*, 2021-Ohio-4136.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## PORTAGE COUNTY

| | |
|---|---|
| STATE OF OHIO, | CASE NO. 2020-P-0066 |
| Plaintiff-Appellee, | |
| - v - | Criminal Appeal from the Court of Common Pleas |
| DANIEL MUGRAGE, | |
| Defendant-Appellant. | Trial Court No. 2019 CR 00213 |

**O P I N I O N**

Decided: November 22, 2021
Judgment: Affirmed

*Victor V. Vigluicci*, Portage County Prosecutor, and *Pamela J. Holder*, Assistant Prosecutor, 241 South Chestnut Street, Ravenna, OH 44266 (For Plaintiff-Appellee).

*Wesley C. Buchanan*, Buchanan Law, Inc., 50 South Main Street, Suite 625, Akron, OH 44308, and *Kelly A. Wojtila*, 803 East Washington Street, Suite 110, Medina, OH 44256 (For Defendant-Appellant).

MARY JANE TRAPP, P.J.

{¶1} Appellant, Daniel Mugrage ("Mr. Mugrage"), appeals from his convictions for rape, two counts of gross sexual imposition, and sexual battery of his girlfriend's eight-year-old daughter, "O.F." Mr. Mugrage was found guilty by a jury on all four counts and sentenced by the Portage County Court of Common Pleas to a term of life imprisonment without parole for rape to be served consecutively to a five-year prison term for gross sexual imposition.

{¶2} Mr. Mugrage raises seven assignments of error on appeal, contending that (1) he was denied a fair trial when the trial court erred by not striking a juror for cause; (2)

the trial court erred in denying his motion in limine and admitting other acts/character evidence against him; (3) the evidence was insufficient to sustain his convictions as a matter of law; (4) the jury's verdict was against the manifest weight of the evidence; (5) his counsel was ineffective for not objecting to and/or moving to continue the trial because of the COVID pandemic; (6) the trial court provided an incorrect jury instruction in response to a jury question; and (7) the trial court erred by not granting his motion for a new trial.

{¶3} After a careful review of the record and the relevant caselaw, we find Mr. Mugrage's assignments of error to be without merit. More specifically:

{¶4} (1) We cannot say the trial court abused its discretion in failing to strike a juror for cause when there was no demonstration of bias or partiality.

{¶5} (2) The trial court did not err in denying Mr. Mugrage's motions in limine because the other acts evidence introduced was inextricably linked with the crime, i.e., it led to the discovery of the incidents, and it was evidence that Mr. Mugrage wanted to establish a three-way sexual relationship with the minor victim and her mother ("Mother").

{¶6} (3) The state introduced sufficient evidence as to the element of sexual contact for the charge of gross sexual imposition, which does not require "skin to skin touching." There was also sufficient evidence that Mr. Mugrage raped O.F. Delayed disclosure of the incidents does not equate to insufficient evidence as to that charge but rather goes to the credibility of the witnesses and the manifest weight of the evidence.

{¶7} (4) That both Mother and O.F. initially lied and/or failed to disclose the incidents when first questioned does not mean the manifest weight of the evidence does

2

not support the jury's verdict, but rather goes to the credibility of the witnesses, whom the jury was free to believe.

{¶8}   (5)  Mr. Mugrage failed to demonstrate any prejudice resulting from holding his trial during the COVID pandemic; thus, we cannot say that but for his counsel's failure to object to and/or move to continue the trial, the outcome would have been different.

{¶9}   (6)  The trial court did not commit plain error when it answered the jury's question regarding the definition of sexual contact during deliberations.  The answer was an accurate statement of the law.

{¶10}  (7)  Lastly, Mr. Mugrage's assignment of error that the trial court erred in denying his motion for new trial is moot since we have found no merit to his arguments in his third and fifth assignments of error, i.e., that the trial was held during the COVID pandemic and that improper other acts evidence was admitted against him.

{¶11}  The judgment of the Portage County Court of Common Pleas is affirmed.

**Substantive and Procedural Facts**

{¶12}  In March 2019, Mr. Mugrage was charged by a secret indictment of the Portage County Court of Common Pleas Grand Jury on four counts:  count one - rape, a first-degree felony, in violation of R.C. 2907.02(A)(1)(b) and R.C. 2971.03(B)(1)(b); counts two and three - gross sexual imposition, third-degree felonies, in violation of R.C. 2907.05(A)(4) and (C)(2); and count four - sexual battery, a second-degree felony, in violation of R.C. 2907.03(A)(5) and (B).

{¶13}  Mr. Mugrage pleaded not guilty at his arraignment.  Since Mr. Mugrage was incarcerated at the time of the hearing for failing to register as a Tier I sex offender from a previous conviction, the court ordered him to remain in the Portage County Jail for the

3

remainder of the proceedings instead of being returned to the Warren Correctional Institution.

*Voir Dire*

{¶14} The case was tried to a jury over a three-day period in August 2020. During voir dire, after the defense used its last peremptory challenge, the next potential juror was questioned further by defense counsel because she had reported on her questionnaire that she knew someone who was abused:

{¶15} "[Defense Counsel]: Is that going to be something that's going to be a problem for you?

{¶16} "[Juror]: No.

{¶17} "[Defense Counsel]: Why do you say that so confidently?

{¶18} "[Juror]: Well, because it was my daughter and my husband. And I confronted him before I took her to the police station and filed all the reports. You have to listen and you have to make judgment. Does the mean [sic] everybody is guilty, no.

{¶19} "[Defense Counsel]: Was there any hesitation on your part on going to the police in that situation?

{¶20} "[Juror]: No.

{¶21} "[Defense Counsel]: Did you live in Portage County when that happened?

{¶22} "[Juror]: Yes.

{¶23} "[Defense Counsel]: Do you remember what police agency you consulted?

{¶24} "[Juror]: Sheriff's Department.

{¶25} "[Defense Counsel]: Did they investigate the case?

{¶26} "[Juror]: Yes. They had all the evidence they needed that night.

4

{¶27} "[Defense Counsel]: Was the case eventually prosecuted?

{¶28} "[Juror]: Yes.

{¶29} "[Defense Counsel]: And I am guessing that your ex-husband was convicted?

{¶30} "[Juror]: Correct.

{¶31} "[Defense Counsel]: And you're satisfied with that result?

{¶32} "[Juror]: I wanted more charges.

{¶33} "[Defense Counsel]: Do you believe the prosecutor's office treated you fairly when that happened?

{¶34} "[Juror]: Very.

{¶35} "[Defense Counsel]: Anything about that experience that would cause you or sway your opinion with anything in this case?

{¶36} "[Juror]: No.

{¶37} "[Defense Counsel]: How long ago did that happen?

{¶38} "[Juror]: Fifteen and a half years.

{¶39} "[Defense Counsel]: Was a plea bargain reached or that case go to trial; do you remember?

{¶40} "[Juror]: Plea bargain.

{¶41} "[Defense Counsel]: How is your daughter doing now?

{¶42} "[Juror]: She's never been the same.

{¶43} "[Defense Counsel]: That's very tragic to hear. And you say you can set that aside and you'll be fair and impartial in this case?

{¶44} "[Juror]: Yes."

5

{¶45} Defense counsel challenged the juror for cause, acknowledging that while her verbal responses were impartial, her non-verbal language was contradictory – she was "sitting arms crossed, face contorted." The prosecutor disagreed, remarking he did not observe the juror "being uncomfortable" and noting she gave fair answers to the ultimate question of whether she could set aside any biases or animosity she may have had regarding her own family's case and to be fair and impartial toward the defendant.

{¶46} The trial court overruled the challenge and determined that the juror did not appear to exhibit "anything that would be suspect in terms of her ability other than what she said to sit as a fair and impartial juror." Additionally, defense counsel was confused as to whether the juror had disclosed the abuse on her questionnaire. Remembering that she had, counsel apologized to the court for confusing her with another juror.

### Motions in Limine

{¶47} Mr. Mugrage filed two motions in limine to prohibit the state from introducing salacious photographs and communications between him and Mother relating to O.F., which were shared while he was incarcerated along with evidence that he was asking Mother to smuggle contraband. He also sought to prohibit any reference to his incarceration.

{¶48} After selecting the jury and prior to opening statements, the trial court granted Mr. Mugrage's motion in limine to prohibit any discussion of the fact that he is indigent.

{¶49} As to Mr. Mugrage's motions in limine regarding other illegal acts, including his status as a Tier I sex offender and his conviction for failure to register, his incarceration at the time of trial, as well as salacious letters and photographs and request for

6

contraband that were exchanged between Mother and Mr. Mugrage while he was in prison, the state argued that they would be presented only where relevant.

{¶50} The state agreed with Mr. Mugrage that it was not relevant to tell the jury that he was a registered sex offender and that he had convictions for failing to register and gross sexual imposition, nor was it relevant why he was incarcerated at the time of trial. However, the state argued that the communications and photographs were not "other acts" evidence but evidence of admissions of guilt directly related to the crimes at issue. Defense counsel responded that the other allegations were not connected to the crimes Mr. Mugrage was facing at trial and unduly prejudicial.

{¶51} The trial court overruled Mr. Mugrage's motion, stating that it was of the opinion that the alleged illegal acts that occurred while Mr. Mugrage was in prison were connected to the earlier crimes alleged in this case because the evidence presented necessarily involved why Mother was reporting to the Garrettsville Police what Mr. Mugrage was allegedly asking her to do, particularly the proposed sexual activity concerning her daughter. It was Mother's revelation of this proposed illegal sexual activity that prompted the law enforcement investigation and led to the disclosure of the crimes at issue. As long as it was not the focus of the testimony, the court was prepared to allow it.

{¶52} However, the court cautioned it would not allow the state to elicit further objectionable evidence as to why Mr. Mugrage was in prison, the length of time he was incarcerated, or that he is a convicted sex offender. The court also indicated it would give the jury a limiting instruction regarding any other illegal activity or perceived illegal activity.

7

## *The Jury Trial*

{¶53} The facts presented at trial revealed that in the summer of 2017, Mother was in a relationship with Mr. Mugrage. Sometime in July, Mother and O.F. went to Mr. Mugrage's apartment. The three were "hanging out" that evening watching television and eating pizza. At some point, O.F. began playing with Mr. Mugrage's kitten in the kitchen, while Mother and Mr. Mugrage were in the living area on the couch, smoking marijuana and cigarettes. The couple began "making out," and Mother started manually stimulating Mr. Mugrage, hiding his genitals from plain view with a pillow.

{¶54} Mr. Mugrage told her to call her daughter over, and Mother did so, telling O.F. to put her hand on top of hers and began to demonstrate how to manually stimulate Mr. Mugrage. At some point, Mother told Mr. Mugrage she could not continue and stopped. Mr. Mugrage grew angry and went to sleep on the floor since he did not have a bed. He wanted Mother and daughter to leave, but Mother was fearful her own mother would be angry about bringing O.F. home so late. Mr. Mugrage assented but said they would have to leave in the morning.

{¶55} After Mother fell asleep on the couch, she heard her daughter crying and "whining" and observed Mr. Mugrage by O.F., who were both sleeping on the floor. Mother told O.F. to roll over and try to go back to sleep. At about 4 a.m., Mother heard O.F. "whining" again. Mother did not roll over to look, but she heard Mr. Mugrage say to O.F. "it's only fair that you touched me, so I get to touch you." O.F. said she did not want to. Mr. Mugrage "got mad," and Mother told her to "just let him." O.F. testified she did not want him "to get mad" at her mom "or hurt her," so she let him touch her.

Case No. 2020-P-0066

{¶56} O.F. testified that Mr. Mugrage told her to take her clothes off. He had a lit candle and his telephone with the flashlight on and was looking at her genitals. Eventually he began to finger the inside of her vagina.

{¶57} Mother and O.F. left the next morning. While they were driving, Mr. Mugrage called Mother. Mother told him "[O.F.] never wants to see you again. We can't come over." Mr. Mugrage asked to talk to O.F., and both Mother and O.F. could hear the call via the car's speakerphone. He told O.F. he was "sorry that he hurt her and it would never happen again."

{¶58} During the next year, Mother continued to have contact with Mr. Mugrage, via phone calls, correspondence, or prison visits (Mr. Mugrage was serving a prison sentence for failing to register as a sex offender). He would ask her to bring him contraband at prison visits. Mother would bring O.F. on those visits "because he wanted to make us feel like a family. * * * He said he wanted to be her stepfather." During this time period she considered themselves to be a couple.

{¶59} In a disturbingly sexually-graphic letter, Mr. Mugrage asked Mother for photos of O.F. and Mother's niece, specifically asking for photos of the girls' feet and toes, and describing a three-way sexual encounter he wanted to have with Mother and O.F. If the photos were not to his liking, he would "yell" at her. Mother also sent him pictures of O.F. in provocative poses or in Mother's nightgown.

{¶60} A little over a year after the incidents at his apartment, Mother walked into the Garrettsville Police Department with her own mother and explained to the police that her boyfriend was currently incarcerated and wanted her to take drugs and cell phones into the prison. She brought the graphic letter with her to the police station.

9

{¶61} Mother testified that she went to the police station because she needed to "clear her life up" and "make sure Daniel Mugrage was not going to be in my life anymore." She explained that Mr. Mugrage sent her the letter from prison about two months before she came to the police, and he told her to destroy it after she read it. She was communicating with Mr. Mugrage at that time through written letters and JPay, the texting system between inmates and their families, which allowed them to send photos and text messages to each other.

{¶62} While in prison, Mr. Mugrage continually asked for photographs of Mother, her niece, her cousin, O.F., and other girls, including the daughter of an acquaintance on Facebook and another girl that she had never met. He also asked for photos of their "feet and toes and stuff."

{¶63} At the time of the trial, Mother was facing the same charges as Mr. Mugrage and admitted on the witness stand that her testimony was a full confession to complicity to gross sexual imposition and the rape of her daughter.

{¶64} Officer Joshua Wilde ("Officer Wilde") of the Garrettsville Police Department testified that on August 29, 2018, he was at the station when Mother and her mother came into the lobby. Grandmother advised him that Mother had become involved with an individual and had some matters to report. Mother reported that she was involved with Mr. Mugrage, who was in prison at that time. Mr. Mugrage sent her a disturbing letter and encouraged her to bring contraband into the prison. Officer Wilde took the letter and the contraband, which he later logged and secured, and brought into the interview with Sergeant Whan.

{¶65} Having read the explicit letter, Sergeant Whan asked Mother why Mr. Mugrage "would be so comfortable as to speak to her like that…why would he think that is okay?" Mother at that time denied anything had ever happened to lead Mr. Murage to make him think it was okay. She told the police he had never been alone with O.F. and he did not touch her.

{¶66} That exchange prompted Sergeant Whan to speak with O.F. at her school. He instructed the school resource officer to have O.F. removed from class, and he contacted Portage County Children Services to alert them to the contents of the letter and his concerns. While in a private room with Sergeant Whan, O.F. did not admit that anything happened, but she did describe pictures that her mom took of her in her mom's nightgown.

{¶67} Mother was in another room at the school, and when questioned by Sergeant Whan, admitted taking the provocative pictures, including pictures of her niece and other children she had taken from Facebook. At that point, Sergeant Whan, concerned for O.F.'s safety, contacted Children Services to remove O.F. from her mother's home.

{¶68} A social worker arrived at the school and also interviewed O.F. The social worker reported to Sergeant Whan that O.F. disclosed that Mr. Mugrage had inappropriately touched her, but no further details were given to him.

{¶69} With that information, Sergeant Whan determined that the Children's Advocacy Center of Portage County (the "Center") needed to become involved, which is customary practice when anyone under the age of eighteen may have been involved in a sexual assault. O.F. went to an interview at the Center within a week of the school

11

interview but did not disclose any inappropriate touching. She did mention Mr. Mugrage's name a few times and said several times that she did not want to get her mother into trouble.

{¶70} On November 14, 2018, Sergeant Whan was notified that O.F. disclosed the allegations of sexual contact to her school counselor, Allison Caser. Sergeant Whan met again with O.F., who, without a question being posed, made the same disclosures to him, which caused him to set up a second interview with the Center.

{¶71} Rachel Peterson ("Ms. Peterson"), a registered nurse at the Center, conducted both interviews with O.F. As noted earlier, during the first interview, O.F. did not disclose any allegations, but prior to their second interview in January 2019, O.F. told her school counselor she wanted to go back to the Center. The interview at the Center was videotaped and a report generated, which were made available to the police, social worker, and prosecutor.

{¶72} Sergeant Whan spoke with Mr. Mugrage, who called to obtain information about the investigation. During the call, Mr. Mugrage denied writing the letter despite the fact that the sergeant never told him about the letter.

{¶73} Officer Christopher Dynys, the evidence officer for the Garrettsville Police Department, testified that he took the letter to the Bureau of Criminal Investigation ("BCI") for lab testing. Sarah Pivovar, a forensic scientist for BCI, identified Mr. Mugrage's fingerprint on the letter. Also admitted into evidence were a drawing of the layout of Mr. Mugrage's rented apartment; the letter provided by Mother to the Garrettsville Police Department; photographs, including those of O.F.; and the BCI report.

12

{¶74} The defense made a Crim.R. 29 sufficiency of the evidence motion as to two counts in the indictment. The defense argued that the state failed to prove an element of gross sexual imposition in that O.F. never touched Mr. Mugrage because her hand was on her mother's hand at all times. Second, the state failed to prove one of the key elements of the sexual battery charge because there was no testimony that Mr. Mugrage was in loco parentis at the time of the incident.

{¶75} The state countered that there was more than enough evidence of "touching" because Mother testified that she was demonstrating to her daughter how to manipulate Mr. Mugrage's genitals and that "touching" can occur through another object or person. Secondly, the state asserted there were enough facts in the evidence from which the jury could find Mr. Mugrage was in loco parentis at the time because of the nature of his relationship with Mother and the fact that she was an invitee in his home, which triggered a duty of care for the child's protection and support while in his home.

{¶76} The trial court overruled the motion.

{¶77} The defense presented a single witness, Shelly Mugrage, Mr. Mugrage's mother, who testified that Mr. Mugrage moved in with her in June 2017 and that he came home every night he was living with her.

### Jury Deliberations

{¶78} After closing arguments and jury instructions, the jury retired for deliberations. Soon after, the jury sent a note to the court, which read: "Count Two – Because [O.F.'s] hand was not directly on the Defendant's penis, does it still constitute sexual contact?"

13

{¶79} The trial court reread the pattern instruction on gross sexual imposition to the jury and further informed them "that an object or intermediary can be used and skin to skin contact is not required as long as you find a touching occurred."

### *Jury Verdict and Sentencing*

{¶80} The jury returned a verdict of guilty on all four counts.

{¶81} At the sentencing hearing approximately one month later, the state elected to proceed on count one, rape, and count three, gross sexual imposition, of the indictment. Accordingly, count two (gross sexual imposition) merged with count one (rape), and count four (sexual battery) merged with count three (gross sexual imposition). The trial court sentenced Mr. Mugrage to life imprisonment without parole on count one, to be served consecutively to a five-year sentence of imprisonment on count three, and found him to be a Tier III sex offender.

{¶82} Mr. Mugrage raises seven assignments of error on appeal:

{¶83} "[1.] The trial court erred by not striking a juror for cause.

{¶84} "[2.] The trial court erred by admitting character evidence against Daniel, in violation of his Federal and Ohio Constitutional rights.

{¶85} "[3.] The evidence against Daniel was insufficient as a matter of law to support his convictions.

{¶86} "[4.] Daniel's convictions were not supported by the manifest weight of the evidence.

{¶87} "[5.] Daniel received ineffective assistance of counsel.

{¶88} "[6.] The trial court provided an incorrect jury instruction.

{¶89} "[7.] The trial court erred by not granting Daniel's motion for a new trial."

14

**Voir Dire – Striking for Cause**

{¶90} In his first assignment of error, Mr. Mugrage contends the trial court erred in failing to strike a juror for cause who had a family history of sexual abuse under similar circumstances.

{¶91} A court of appeals reviews a trial court's ruling on a challenge for cause for an abuse of discretion. *State v. Courie*, 11th Dist. Ashtabula No. 2014-A-0043, 2015-Ohio-2894, ¶ 18. An abuse of discretion is the trial court's "'failure to exercise sound, reasonable, and legal decision-making.'" *State v. Beechler*, 2d Dist. Clark No. 09-CA-54, 2010-Ohio-1900, ¶ 62, quoting *Black's Law Dictionary* 11 (8th Ed.2004).

{¶92} When evaluating whether a defendant was denied a fair and impartial jury "[t]he relevant inquiry * * * is '"whether the composition of the jury panel as a whole could possibly have been affected by the trial court's error."'" (Citations omitted.) *State v. Gipson*, 11th Dist. Lake No. 2018-L-093, 2019-Ohio-1165, ¶ 13, quoting *State v. Broom*, 40 Ohio St.3d 277, 287, 533 N.E.2d 682 (1988). Thus, in order for a constitutional violation to occur, the defendant must have used all of his peremptory challenges and be able to demonstrate that one of the jurors seated was not impartial and that the juror in question must have been challenged for cause. *Id. See also State v. Freshwater*, 11th Dist. Lake No. 2002-L-041, 2004-Ohio-384, ¶ 17. Otherwise, "he is presumed to be impartial and the defendant was not forced to use a peremptory challenge." *Id.*, quoting *Broom*, *supra*.

{¶93} Specifically, Mr. Mugrage contends the juror in question demonstrated a bias or inability to be impartial via her nonverbal cues and physical demeanor. As our review of the trial transcript indicates, however, neither the court nor the state observed

15

any nonverbal cues that demonstrated a bias or that the juror could not be impartial. In addition, defense counsel admitted he had confused the juror's questionnaire with another juror and that none of her verbal answers demonstrated partiality or bias.

{¶94} As we succinctly noted in *State v. Wolfe*, 81 Ohio App.3d 624, 611 N.E.2d 976 (11th Dist.1992), "[n]o prejudicial error can be assigned to the examination of prospective jurors absent a clear abuse of discretion." *Id.* at 629. In *Wolfe*, after the defense used its last peremptory challenge, the next juror requested a conference in chambers where he revealed that he was a victim of child molestation and that he understood delayed reporting in children who are victims of sexual abuse. *Id.* Just as the juror did in this case, the juror in *Wolfe* indicated he was able to be a fair, unbiased, and unprejudiced witness and would not let his history interfere with his judgment. *Id.* We likewise conclude the trial court in this case did not abuse its discretion in determining the juror to be fair and impartial and that defense counsel was allowed to question the juror at length. *See id.*

{¶95} This case is also in accord with the Supreme Court of Ohio's decision in *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.2d 930, where the court found the trial court did not abuse its discretion in rejecting a challenge for cause where the juror, who had a history of sexual assault and a history with the prosecutor's office, assured the court her prior dealings with the prosecutor would not influence her consideration of the appellant. *Id.* at ¶ 96. Furthermore, her answers demonstrated she would be a fair-minded juror. *Id.* There was nothing to indicate, as in this case, that the juror's history of sexual assault would cause her to be biased against the appellant. *Id.*

16

{¶96} Mr. Mugrage has not demonstrated that the trial court abused its discretion in failing to strike the juror for cause, and there is no evidence on the record of any juror bias or partiality.

{¶97} Mr. Mugrage's first assignment of error is without merit.

## Other Acts Evidence

{¶98} In his second assignment of error, Mr. Mugrage contends the trial court erred in admitting other acts or character evidence against him. More specifically, he contends the trial court improperly admitted his letter to Mother sent from prison, as well as the photographs Mother took of O.F. for Mr. Mugrage while he was incarcerated.

{¶99} The general principle that guides admission of evidence is that "[a]ll relevant evidence is admissible * * *." Evid.R. 402.

{¶100} Evid.R. 403 provides exceptions to this general principle and provides circumstances for the exclusion of relevant evidence.

{¶101} Another exception to the principle that all relevant evidence is admissible is Evid.R. 404(B), which provides, "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

{¶102} Evid.R. 404 codifies the common law with respect to evidence of other acts of wrongdoing. *State v. Lowe*, 69 Ohio St.3d 527, 530, 634 N.E.2d 616 (1994). The rule contemplates acts that may or may not be similar to the crime at issue. *Broom*, *supra*, at 282. If the other act is offered for some relevant purpose other than to show character

17

and propensity to commit crime, such as one of the purposes in the listing, the other act may be admissible. *Id.* Another consideration permitting the admission of certain other acts evidence is whether the other acts "form part of the immediate background of the alleged act which forms the foundation of the crime charged in the indictment" and are "inextricably related" to the crime. *State v. Curry*, 43 Ohio St.2d 66, 73, 330 N.E.2d 720 (1975). *See also Broom* at 282.

{¶103} The key is that the evidence must prove something other than the defendant's disposition to commit certain acts. *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, ¶ 22. Thus, while evidence showing the defendant's character or propensity to commit crimes or acts is forbidden, evidence of other acts is admissible when the evidence is probative of a separate, nonpropensity-based issue. *Id.*

{¶104} The admissibility of other-acts evidence pursuant to Evid.R. 404(B) is a question of law. *Id.*, citing Leonard, *The New Wigmore: Evidence of Other Misconduct and Similar Events*, Section 4.10 (2d Ed.2019) (because "[d]etermining whether the evidence is offered for an impermissible purpose does not involve the exercise of discretion * * *, an appellate court should scrutinize the [trial court's] finding under a *de novo* standard" of review); *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 17 (the trial court is precluded by Evid.R. 404(B) from admitting improper character evidence, but it has discretion whether to allow other-acts evidence that is admissible for a permissible purpose).

{¶105} As our review of the procedural facts indicates, the trial court denied Mr. Mugrage's motions in limine in part, allowing the admission of his letter to Mother and the

18

photographs Mother took of her daughter, even though both occurred at a later time than the allegations that were being tried.

{¶106} The trial court limited this evidence to prohibit the jury from discovering his previous convictions and the reason he was incarcerated at the time of trial. The trial court's rationale for admitting this evidence was that it was inextricably linked to the crimes at issue. The contents of the letter and the request for provocative photographs of her daughter led to Mother's decision to report to the Garrettsville Police what Mr. Mugrage was asking her to do in terms of smuggling contraband to him and particularly the proposed three-way sexual activity he proposed involving her daughter. This reporting prompted the investigation that uncovered the incidents.

{¶107} In addition, the trial court gave a limiting instruction in regard to any other illegal activity or perceived other illegal activity, instructing the jury that "[e]vidence was received that the Defendant was incarcerated at certain times. That evidence was received only for a limited purpose. It was not received, and you may not consider it to prove the character of the Defendant in order to show that he acted in conformity with that character."

{¶108} Our threshold inquiry for determining admissibility is whether the evidence is relevant. *Hartman* at ¶ 24. From a review of the evidence, we agree with the trial court that this evidence was relevant to the crime and inextricably linked to its discovery. Mother's visit to the Garrettsville Police Department, her stated reasons why she was there, and the fact that O.F. was one of the objects of the salacious letter prompted the investigation of these crimes, and one could not present evidence of those crimes without

19

necessarily including this evidence in the timeline of events.  Mr. Mugrage was seeking an ongoing three-way sexual relationship with the victim and her mother.

{¶109} As the Supreme Court of Ohio recently explained in *Hartman:*

{¶110} "Common-plan evidence generally concerns events that are 'inextricably related' to the crime charged.  Weissenberger[, *Federal Evidence,*] * * *[,] Section 404:18 [(7th Ed.2019)]; *Curry*, 43 Ohio St.2d at 73, 330 N.E.2d 720.  The other acts form the 'immediate background' of the present crime:  they are typically either part of the 'same transaction' as the crime for which the defendant is on trial or they are part of 'a sequence of events' leading up to the commission of the crime in question.  Weissenberger at Section 404:18.  As one authority has explained, this type of other-acts evidence is admitted '[t]o prove the existence of a larger, continuing plan, scheme, or conspiracy, of which the present crime on trial is a part.  This will be relevant as showing motive, and hence the doing of the criminal act, the identity of the actor, and his intention, where any of these is in dispute.'  McCormick at 448-449.  Thus, plan evidence generally supports one of the following possible conclusions:  '(1) the occurrence of the act in issue; (2) the identity of the person who committed the act; or (3) the existence of the required mental state in the actor.'  Leonard at Section 9.1."  *Id.* at ¶ 41.

{¶111} The second part of our inquiry is whether, even if the evidence is relevant, it is nevertheless more prejudicial than probative.  *Hartman* at ¶ 29.  For this portion of our analysis, we review the trial court's determination for an abuse of discretion.  *Id.* at ¶ 30.  As the Supreme Court of Ohio remarked, "Weighing the probative value of the evidence against its prejudicial effect is a highly fact-specific and context-driven analysis.  Balancing the risks and benefits of the evidence necessarily involves an exercise of

20

judgment; thus, the trial court's determination should be reviewed for an abuse of discretion.  *See* Leonard at Section 4.10 (because the trial court is in the best position to observe the demeanor of the witnesses and jurors, 'the appellate court should defer to the trial court's judgment of the weight of the various dangers as applied to each piece of evidence')."  *Id.* at ¶ 30.

{¶112} It is here that the trial court's limiting instruction becomes important because the trial court took the proper steps to limit the danger of unfair prejudice that is inherent in the use of such evidence and to ensure that the evidence was only considered for a proper purpose.  *See Hartman* at ¶ 34.

{¶113} Even if we were to find the trial court abused its discretion in admitting the letter and photographs, all of which were disturbing, any error would be harmless given the overwhelming evidence of guilt by way of O.F. and Mother's testimony, as well as that of the law enforcement officers and the registered nurse.  *See State v. Williams*, 5th Dist. Delaware No. 20 CAA 03 0017, 2021-Ohio-1250, ¶ 34 (because there was overwhelming evidence by way of the victims' testimonies, any error in admitting testimony showing the appellant's motive to show sexual gratification for groping and raping children was harmless beyond a reasonable doubt and had no impact on the verdict).

{¶114} Mr. Mugrage's second assignment of error is without merit.

### Sufficiency of the Evidence

{¶115} In Mr. Mugrage's third assignment of error, he contends the evidence is insufficient as a matter of law to sustain his convictions because the charges of gross sexual imposition, rape, and sexual battery are not supported by the evidence.

Case No. 2020-P-0066

{¶116} "'"[S]ufficiency" is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.'" *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997), quoting *Black's Law Dictionary* 1433 (6th Ed.1990). "In essence, sufficiency is a test of adequacy." *Id.*

{¶117} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*

{¶118} When conducting a sufficiency of the evidence analysis, this court is to look at the actual evidence admitted at trial, both admissible and inadmissible. *State v. Rose*, 11th Dist. Lake No. 2014-L-086, 2015-Ohio-2607, ¶ 34. Further, a claim of insufficient evidence invokes a question of due process, the resolution of which does not allow for a weighing of the evidence. *Id.* at ¶ 33.

### Gross Sexual Imposition

{¶119} Mr. Mugrage contends the state failed to introduce sufficient evidence on count three, gross sexual imposition. Specifically, Mr. Mugrage argues there was no "sexual contact" in this case because O.F. did not directly touch Mr. Mugrage's genitals.

22

{¶120} Pursuant to R.C. 2907.05(A)(4), "[no] person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; *or cause two or more persons to have sexual contact when* * * * [t]he other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person." (Emphasis added.)

{¶121} "'Sexual contact' means any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).

{¶122} "[I]n proving the violations of R.C. 2907.05(A)(4) * * *, it [is] incumbent upon the state to prove not only that [the defendant] touched a person less than thirteen years of age or caused a person under age thirteen to touch him on the proscribed parts of the body listed in R.C. 2907.01(B), * * * but *also* that [the defendant] committed these acts for the specific purpose or intention of sexually arousing or gratifying either himself or the victim." (Emphasis sic.) *State v. Mundy*, 99 Ohio App.3d 275, 287, 650 N.E.2d 502 (2d Dist.1994). Therefore, "the state is obligated to prove beyond a reasonable doubt that the defendant's purpose or specific intention in touching the victim on the proscribed areas of the body set out in R.C. 2907.01(B) was sexual arousal or gratification of either the perpetrator or the victim." *Id.* at 288; *State v. Barnes*, 2d Dist. Montgomery No. 25517, 2014-Ohio-47, ¶ 20

{¶123} A review of the evidence reveals the state introduced more than sufficient evidence of "sexual contact" in this case. Mr. Mugrage relies heavily on whether there

23

was sexual contact between him and the victim, but he ignores the fact that he set the parameters of this specific sexual contact – a three-way sexual encounter.

{¶124} Mother testified that Mr. Mugrage told her to ask O.F. to join them and that the act was done for the purpose of sexual gratification. She further testified that she was demonstrating to the child how to manipulate Mr. Mugrage's genitals. O.F. testified that she observed her mom and Mr. Mugrage "making out" on the couch, and her mother asked her to join them. Her mother asked her "to touch Daniel's genitals." She also testified that her mother instructed her to put her hand on top of her hand and demonstrated the action they were performing on Mr. Mugrage's genitals. Moreover, even if the incident had occurred solely between Mr. Mugrage and the victim, sexual contact does not require that the offender have skin-to-skin contact with an erogenous zone of the victim or, conversely, the victim with the erogenous zone of the offender. *Barnes* at ¶ 19; *State v. Jones*, 2d Dist. Clark No. 2012-CA-95, 2013-Ohio-3760, ¶ 21 (finding sufficient evidence of sexual contact where appellant touched victim's clothing covering an erogenous zone).

{¶125} Quite simply, "skin to skin contact" between O.F. and Mr. Mugrage is not necessary. Under these circumstances, there is sufficient evidence from which a jury could find sexual contact occurred between Mr. Mugrage and the victim.

### *Rape*

{¶126} Mr. Mugrage also contends there was insufficient evidence to support his conviction for rape because O.F. did not initially report the incidents at his apartment.

{¶127} Pursuant to R.C. 2907.02(A)(1)(b), "[n]o person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the

24

offender but is living separate and apart from the offender, when * * * [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the person."

{¶128} "'Sexual conduct' means vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse." R.C. 2907.01(A).

{¶129} Mr. Mugrage argues there was insufficient evidence of sexual conduct because O.F.'s earlier assertions were contradictory to her later disclosures. In the beginning of the investigation, she gave a statement to the Garrettsville Police Department that nothing inappropriate happened and she denied anything inappropriate occurred between her and Mr. Mugrage on several occasions.

{¶130} The evidence reveals that despite O.F.'s delayed reporting, she disclosed the allegations to several people, including the police, the social worker, the nurse at the Center, and her school counselor. O.F. described the crime in detail, and Mother corroborated the incidents. Furthermore, there was evidence presented as to delayed child reporting by way of Ms. Peterson, the registered nurse at the Center, who interviewed O.F. two times.

{¶131} Simply because there was evidence that O.F. denied the allegations in the beginning of the investigation does not lead to the conclusion that the state failed to introduce sufficient evidence. Indeed, even contradictory evidence does not give rise to

25

a sufficiency argument; rather, it goes to the manifest weight of the argument and the credibility of the witnesses. As the Supreme Court of Ohio held in *Thompkins*, *supra*, sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, but weight of the evidence addresses the evidence's effect in inducing belief. *Id.* at 386-387.

### *Sexual Battery*

{¶132} Mr. Mugrage also challenges the sufficiency of the evidence as to his conviction of sexual battery because there was no evidence that O.F. was acting in loco parentis, i.e., "in the place of a parent."

{¶133} We decline to address this portion of Mr. Mugrage's assignment of error because his sufficiency of the evidence arguments as to any offense other than rape or gross sexual imposition is harmless error. Count four, sexual battery, was merged with count three, gross sexual imposition. When counts in an indictment are allied offenses and there is sufficient evidence to support the offense on which the state elects to have the defendant sentenced, the appellate court need not consider the sufficiency of the evidence on the count that is subject to merger because any error would be harmless. *State v. Ramos*, 8th Dist. Cuyahoga No. 103596, 2016-Ohio-7685, ¶ 14. *See also State v. Powell*, 49 Ohio St.3d 255, 263, 552 N.E.2d 191 (1990) (since the trial court merged convictions with one another, the appellant received only one sentence, and an erroneous verdict on the merged count would be harmless beyond a reasonable doubt)

{¶134} Mr. Mugrage's third assignment of error is without merit.

26

**Manifest Weight of the Evidence**

{¶135} In his fourth assignment of error, Mr. Mugrage contends his convictions are not supported by the manifest weight of the evidence because O.F. and Mother changed their stories as the investigation proceeded.

{¶136} "[W]eight of the evidence addresses the evidence's effect of inducing belief." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25. "In other words, a reviewing court asks whose evidence is more persuasive—the state's or the defendant's?" *Id.*

{¶137} "'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins*, *supra*, at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶138} "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Id.*, quoting *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). "'The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Id.*, quoting *Martin* at 175.

{¶139} More specifically, Mr. Mugrage contends that the manifest weight of the evidence does not support the verdict because O.F. admitted on the stand that she would

27

lie for her mother. He further argues that Mother, who admitted to smoking marijuana during the night of the incidents, did not witness the alleged rape and that she was merely attempting to get a lighter sentence by testifying against him.

{¶140} We find the weight of the evidence more than supports the jury's verdict. Once O.F. began disclosing the incidents, her story did not change, nor did her mother's. O.F. testified that she did not initially disclose the allegations because she did not want her mother to get mad or in trouble and that after she moved residences, she felt safer discussing the incidents.

{¶141} Further, Mother admitted she knew she was confessing to crimes of gross sexual imposition and her daughter's rape and was facing a similar fate as that of Mr. Mugrage. She explained why she lied, telling the jury she was "not going to sit here and let him make me out to be a liar and my daughter is not a liar."

{¶142} Mr. Mugrage's arguments go to the credibility of the witnesses. "It is well-settled that when assessing the credibility of witnesses, '[t]he choice between the credibility of witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact.' * * * Furthermore, if the evidence is susceptible to more than one interpretation, a reviewing court must interpret it in a manner consistent with the verdict." *Seasons Coal v. Cleveland*, 10 Ohio St.3d 77, 461 N.E.2d 1273 (1984).

{¶143} Given the disturbing circumstances of this case, the witnesses' testimony as to the reasons for initially failing to disclose the incidents is not surprising, and the jury was free to find them credible. We cannot say that the manifest weight of the evidence does not support the jury's verdict.

28

{¶144} Mr. Mugrage's fourth assignment of error is without merit.

## Ineffective Assistance of Counsel

{¶145} In his fifth assignment of error, Mr. Mugrage contends his trial counsel was ineffective because he did not object to holding a jury trial during the COVID pandemic.

{¶146} In determining whether counsel's performance constitutes ineffective assistance, an appellate court must find that counsel's actions fell below an objective standard of reasonableness and that the appellant was prejudiced as a result. *State v. Stoutamire*, 11th Dist. Trumbull No. 2008-T-0108, 2009-Ohio-6228, ¶ 50; *see also Strickland v. Washington*, 466 U.S. 668 (1984). In performing its review, an appellate court is not required to examine counsel's performance under the first prong of the *Strickland* test if an appellant fails to prove the second prong of prejudicial effect. *Id.* In demonstrating prejudice, an appellant must show that there is a reasonable probability that, but for counsel's errors, the result of the trial would have been different. *Id.* Further, a strong presumption exists that a licensed attorney is competent and that the challenged action is the product of sound trial strategy and falls within the wide range of professional assistance. *Id.*

{¶147} On March 9, 2020, Governor Mike DeWine declared a state of emergency (Executive Order 2020-01D) in response to the COVID-19 pandemic. A few weeks later, on March 20, 2020, the Supreme Court of Ohio issued "Guidance to Local Courts COVID-19 Public Health Emergency" to assist courts in navigating court proceedings during a pandemic. The Supreme Court continued to issue a series of guidance bulletins that left "to the sound discretion of the local judiciary how best to manage the daily challenges that the COVID-19 pandemic ha[d] foisted on local courts * * *." *State ex rel. McArtor v.*

29

*Kovack*, 158 Ohio St.3d 1472, 2020-Ohio-1489, 143 N.E.3d 508, ¶ 14 (Kennedy, J., dissenting).

{¶148} The Chief Justice, along with the Ohio Jury Trial Advisory Group, also released a report giving recommendations on how to best resume jury trials amid the pandemic. The report recommended that jurors share health concerns before trial, that remote juror questionnaires be used, that COVID concerns should allow for deferment as a medical condition, and that older and high-risk jurors should be excused. *Standards and Practices Essential to the Resumption of Jury Trials in Ohio* at 10-12. *See State v. Freeman*, 2d Dist. Greene No. 2020-CA-33, 2021-Ohio-734, ¶ 21-22, *appeal not accepted*, 163 Ohio St.3d 1453, 2021-Ohio-2069, 169 N.E.3d 683.

{¶149} Mr. Mugrage's argument that his counsel was ineffective necessarily fails because he did not demonstrate there was any per se prejudicial effect from holding the jury trial during the COVID pandemic. Thus, we cannot say his counsel was ineffective for failing to object or file a motion to continue.

{¶150} The record reflects that the trial court, the state, and defense counsel were well aware of and took the necessary safety precautions: voir dire was conducted in two separate rooms connected via wi-fi; the witnesses were behind plexiglass so that they did not need to wear masks during their testimony and the jurors could safely observe their demeanor; and counsel for both the defense and the state stated they would take off their masks but would stand far enough away from the jury. The prospective jurors who were more sensitive to contracting the disease were dismissed during voir dire. The record also reveals that aside from discussing and taking these necessary precautions, there were no safety issues, and no one fell ill. We cannot say the actions of the trial court or

30

counsel were unreasonable in the midst of this pandemic, and it does not appear to have affected the trial.

{¶151} Quite simply, Mr. Mugrage must prove prejudice before he can prove that his counsel was ineffective, i.e., that but for his counsel's failures, the result of the trial would have been different.

{¶152} Mr. Mugrage's fifth assignment of error is without merit.

**Jury Instruction**

{¶153} In his sixth assignment of error, Mr. Mugrage contends the trial court erred by providing an incorrect jury instruction to answer the jury's question as to whether "touching" needs to be skin to skin contact. In other words, the jury queried whether O.F.'s hand on top of her mother's hand could be considered "sexual contact." Because Mr. Mugrage failed to object to the instruction, we review for plain error.

{¶154} "'As a general rule, a defendant is entitled to have the jury instructed on all elements that must be proved to establish the crime with which he is charged, and, where specific intent or culpability is an essential element of the offense, a trial court's failure to instruct on that mental element constitutes error.'" *State v. Wamsley*, 117 Ohio St.3d 388, 2008-Ohio-1195, 884 N.E.2d 45, ¶ 17, quoting *State v. Adams*, 62 Ohio St.2d 151, 153, 404 N.E.2d 144 (1980). However, in *Adams*, the Supreme Court of Ohio held that the failure to instruct on each element of an offense is not necessarily reversible as plain error. *Id.*, at paragraph two of the syllabus. Rather, an appellate court must review the instructions as a whole and the entire record to determine whether a manifest miscarriage of justice has occurred as a result of the error in the instructions. *Id.* at paragraph three of the syllabus.

31

{¶155} The Supreme Court of Ohio has rejected the concept that structural error exists in every situation in which even serious error occurred.  *Id.* at ¶ 18; *see State v. Hill*, 92 Ohio St.3d 191, 199, 749 N.E.2d 274 (2001).

{¶156} To rise to the level of plain error, the jury instructions must render the trial so "fundamentally unfair that it could not be a reliable vehicle for the determination of the defendant's guilt or innocence."  *Id.* at ¶ 24.

{¶157} As we explained in our discussion of Mr. Mugrage's third assignment of error involving the sufficiency of the evidence, sexual contact does not require that the offender have skin-to-skin contact with an erogenous zone, particularly under the circumstances of this case, which involved a three-way sexual encounter.  *See Barnes* at ¶ 19; *Jones*, *supra*, at ¶ 21.  As the Third District found in *State v. Goodwin*, 3d Dist. Marion No. 10-93-23, 1994 WL 202828 (May 19, 1994), "R.C. 2907.01(B) does not state that the sexual contact has to be with the bare thigh, genital, buttock, pubic region, or breast.  Rather, the statute refers to the 'erogenous zone' of another[,] thereby, not limiting the contact to the bare skin of another."  *Id.* at *2.

{¶158} Thus, the trial court accurately instructed the jury and provided no misstatements of law when it answered the jury question by explaining "'touching' does not have to be skin to skin contact.  An object or intermediary can be used as long as you find that a touching has occurred."  As the Ninth District aptly stated in *State v. Litton*, 9th Dist. Wayne No. 2087, 1985 WL 4381 (Dec. 11, 1985), "[w]e feel that a court would be in error to hold that 'sexual contact' is limited to touches placed directly on the skin or tissue."  *Id.* at *2.

{¶159} Mr. Mugrage's sixth assignment of error is without merit.

32

## Motion for New Trial

{¶160} In Mr. Mugrage's seventh assignment of error, he contends the trial court erred in denying his motion for a new trial because his trial was held during the COVID pandemic and the trial court admitted improper character evidence against him.

{¶161} We typically review a trial court's denial of a motion for a new trial for an abuse of discretion. *State v. Jordan*, 11th Dist. Lake No. 2009-L-006, 2009-Ohio-6152, ¶ 31. As the Supreme Court of Ohio stated in *State v. Schiebel*, 55 Ohio St.3d 71, 564 N.E.2d 54 (1990), "[a] motion for new trial pursuant to Crim.R. 33(B) is addressed to the sound discretion of the trial court, and will not be disturbed on appeal absent an abuse of discretion." *Id.* at paragraph one of the syllabus.

{¶162} A new trial may be granted on the defendant's motion if his substantial rights are materially affected due to the discovery of new evidence material to the defense which the defendant could not with reasonable diligence have discovered and produced at the trial. Crim.R. 33(A)(6). In order to grant a new trial motion based on newly discovered evidence, the defendant must show the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted; (2) has been discovered since the trial; (3) is such as could not in the exercise of due diligence have been discovered before the trial; (4) is material to the issues; (5) is not merely cumulative to former evidence; and (6) does not merely impeach or contradict the former evidence. *State v. Hawkins*, 66 Ohio St.3d 339, 350, 612 N.E.2d 1227 (1993), applying *State v. Petro*, 148 Ohio St. 505, 76 N.E.2d 370 (1947), syllabus.

{¶163} The record reflects that Mr. Mugrage filed a motion for new trial pro se prior to sentencing. During the sentencing hearing, Mr. Mugrage's defense counsel made an

33

oral motion for a new trial based upon the trial court's answer to the jury question during deliberations regarding "touching" and because the jury was aware of Mr. Mugrage's incarceration at the time of trial. The trial court orally overruled the motion before proceeding with sentencing.

{¶164} Because we addressed the merits of Mr. Mugrage's arguments in his second and fifth assignments of error and found them to be without merit, this assignment of error is overruled as moot.

{¶165} Mr. Mugrage's seventh assignment of error is without merit.

{¶166} The judgment of the Portage County Court of Common Pleas is affirmed.

CYNTHIA WESTCOTT RICE, J., concurs,

THOMAS R. WRIGHT, J., concurs in judgment only with a Concurring Opinion.

_____

THOMAS R. WRIGHT, J., concurs in judgment only with a Concurring Opinion.

{¶167} I fully concur in the majority's discussion and disposition of the first assignment of error as well as the third through seventh assignments of error. I concur in the majority's resolution of the second assignment of error insofar as it concludes that the admission of other acts evidence was harmless.

Case No. 2020-P-0066